THE STATE OF OHIO, APPELLEE, v.
JOHNSON, APPELLANT.

(No. 1776—Decided March 10, 1982.)

*Mr. Martin Frantz,* for appellee.
*Mr. Robert N. Gluck,* for appellant.

MAHONEY, P.J. Appellant Chris D. Johnson appeals his conviction for aggravated drug trafficking claiming that he sufficiently established the defense of entrapment so as to warrant his acquittal. We affirm.

### Facts

In January 1981, Johnson was twenty-one years old with a wife and a small child and lived in a trailer home in Orrville. At the time of the incidents in question in this case, Johnson had been unemployed for approximately six months and there was testimony indicating that his unemployment benefits would soon terminate.

Sometime between January 17 and January 22, 1981, Johnson was approached by an acquaintance named Walt Coleman and another man introduced as Rocky. Rocky was in fact undercover agent Scott Hills of the Medway Enforcement Group (Medway), which specialized in narcotics investigations. Johnson knew Coleman through a neighbor, Danny Stark. In January 1981, Coleman worked as a confidential informer for Medway and was responsible for introducing the agent to Johnson.

Hills claimed that the first contact had occurred January 22, 1981, at Johnson's trailer. Johnson claimed that Coleman and Hills had approached him in Danny Stark's driveway on January 17 or 18, 1981. The evidence is clear that Hills and/or Coleman initiated a conversation asking Johnson if he could get some "hash." Defendant testified that he had said he did not know if he could get any hash. The undercover agents returned the next day asking about the hash and defendant told them he did not have any. Johnson asserted that the agents had asked him for hash on two other occasions.

Hills testified that on January 26, 1981, he and Coleman again had met Johnson at his trailer. This time Hills brought up the subject of buying quaaludes or "ludes" and he asked Johnson if he could get one hundred "ludes" for him. Hills testified that Johnson allegedly had answered that he could get the ludes by the next day. Hills stated that on January 27, defendant had said he could get the ludes for $260; Hills immediately gave Johnson the money. The agents returned on January 28, and defendant eventually showed up with the ludes which he gave to Hills.

Johnson claimed that Hills had made at least two requests for ludes prior to

January 26. Defendant told Hills that he did not "do ludes" and did not know how much they would cost. He testified that on the third request on January 26, he had replied by saying he would call someone. Defendant made a couple of unsuccessful attempts to find some ludes, but when Hills returned Johnson claimed that he had offered to return the $260. Hills did not recall that Johnson had ever offered to return the money. Defendant contended that Hills had told him to keep trying to obtain the ludes since the money belonged to someone else. Hills did not deny that he might have told Johnson that the money belonged to another person.

Johnson testified that he was afraid of Hills' size and that he felt pressured by the numerous visits from Hills and Coleman. On January 28, 1981, after failing to find any ludes among some friends, the defendant contacted a friend named Mark Pamer. Pamer took Johnson to Akron where a friend of Pamer took the money Hills had given defendant and returned with some ludes. When Johnson returned to Orrville, Coleman and Hills were waiting in Johnson's driveway for the ludes. According to Johnson, Hills told him that he would get in touch with defendant if the ludes were not any good.

A few weeks later, approximately February 16, 1981, Hills again approached Johnson at his trailer to ask if defendant could get two hundred ludes for less than $500. Hills testified that Johnson responded by saying "probably" and that he would call Hills the following morning. Hills claimed that Johnson called the following morning to say he could get two hundred ludes for $480.

Johnson's version of the second transaction was somewhat different. He asserted that Hills and Coleman on two occasions prior to February 16, 1981, had stopped to see if they could get more ludes or hash. Hills denied this. Johnson claimed that on February 15 and 16, 1981, he had contacted some friends who did not know where he could get the ludes. He contended that Hills again had referred to this other person who wanted his ludes, indicating that the money belonged to someone else.

Defendant testified that he had offered Hills his money back again when he did not have any ludes on the 17th, but Hills had stated that he would rather have the ludes. Johnson recalled that Hills had returned on the night of February 17, and that he had seemed desperate for the ludes. Defendant stated he had told Hills that he and his wife would go to Doylestown to find some ludes. He returned late on the 17th and gave the ludes to Hills. He also stated that he got tired of Hills coming around all the time. Johnson expressed apprehension over the statement Hills had made when he had given defendant the money for the ludes on February 17, to the effect that if Johnson ran off with the money Hills knew where he lived. On each sale defendant made only $20 profit.

Johnson did not deny Hills' contention that following the second sale defendant had told Hills that if he purchased five hundred ludes he (defendant) could get Hills a better price. Johnson admitted to having smoked marijuana with Coleman and Stark prior to January 1981, and once during January 1981, in the presence of both Coleman and Hills. However, defendant denied any previous attempts to sell any drugs of any kind and the state presented no evidence of any other trafficking conduct. The jury found Johnson not guilty on Count I of the indictment which was predicated on the January 28, 1981 sale. On Count II, which charged aggravated trafficking for the February 17, 1981 sale, the jury found Johnson guilty.

### Assignment of Error No. 1

"1. A delay of four (4) months from time of the offense to time of indictment was impermissible under the Sixth Amendment to the United States Constitution."

Defendant alleges that the four

month period between the commission of the offense charged and the filing of the indictment constituted an impermissible delay in violation of his speedy trial right. In support of this argument appellant cites *Barker* v. *Wingo* (1972), 407 U.S. 514, a case relating to whether the constitutional right to speedy trial had been violated. The first factor discussed in *Barker* is the length of the delay, to which the following statement is relevant:

"* * * Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance. * * *." *Barker, supra,* at 530.

We find that a four month delay between the time of an offense and indictment for that offense is not presumptively prejudicial. Neither are there circumstances in this case which warrant a finding that the defendant suffered an unconstitutional delay. Therefore, we find no prejudice to defendant because of the four month delay prior to indictment.

Assignments of Error Nos. 2 and 4

"2. The court committed error prejudicial to the defendant for failing to grant the motion for acquittal made at any of the stages in the proceeding."

"4. The jury verdict finding the defendant guilty as to Count II is against the manifest weight of the evidence."

The essential issue in this case focuses on whether Johnson established the defense of entrapment. He admitted that he had made the two sales of quaaludes for which he was charged and, therefore, the only question before the jury was whether the evidence supported the claimed defense.

Entrapment is a "confession and avoidance" defense in which the defendant admits committing the acts charged, but claims that the criminal design arose with the state's agent. See *State* v. *Strock* (Aug. 23, 1978), Wayne App. No. 1561, unreported. The primary consideration in any determination of entrapment is the defendant's predisposition to commit the crime. *United States* v. *Russell* (1973), 411 U.S. 423, 433; *Sherman* v. *United States* (1958), 356 U.S. 369; *Sorrells* v. *United States* (1932), 287 U.S. 435.

"* * * Entrapment occurs only when the criminal conduct was 'the product of the *creative* activity' of law-enforcement officials. * * * To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal. * * *.

"* * *.

"However, the fact that government agents 'merely afford opportunities or facilities for the commission of the offense does not' constitute entrapment. * * *." *Sherman, supra,* at 372.

See, also, *Sorrells, supra,* and *State* v. *McDonald* (1972), 32 Ohio App. 2d 231 [54 O.O.2d 6].

Therefore, in the present case the crucial question to be resolved is whether there is credible evidence of Johnson's predisposition to sell quaaludes. Did Agent Hills merely provide the opportunity for Johnson to do what he was already predisposed to do, or was the sale of the product the creative act of Hills, designed to trap an innocent Johnson?

Johnson offered evidence of his poor economic status, unemployment, his physical fears of the agent, his previous good record, his non-involvement with selling drugs prior to January 28, and the persistence of the agent. A psychologist testifying for Johnson stated that he (Johnson) had subnormal intelligence; a verbal IQ of seventy-six; a composite mental age of 10.5; reasoning ability at a 7.5 year old level; that there was some evidence of paranoid schizophrenia; that he did not comprehend this as a crime because being helpful to someone was important to Johnson; that he did not have the ability to withstand the pressure exerted or use normal restraints to illegal activity.

Were we the triers of fact, we might

look with disdain upon the agents' persistence in presenting the opportunity for criminal activity to one who might be considered weak in character and mentally incapable of resisting pressures. But this is not our function, it is the jury's. After reviewing the record, we conclude that there was sufficient evidence, if believed by the jury, to establish Johnson's predisposition to sell quaaludes on February 17, 1981. Likewise, the jury could choose to believe or disbelieve the evidence offered by Johnson as to the lack of predisposition.

We recognize that the jury acquitted Johnson on Count I of the indictment. Even though the defendant offered entrapment as his only defense, we cannot presume that the jury found that Johnson established entrapment as to the first count. Each count of an indictment is independent of the other counts. Therefore, although defendant has been absolved of criminal responsibility with the jury's verdict on Count I of the indictment, the January 28 sale is valid, credible evidence of Johnson's disposition to sell again in February. The three week interim between sales allowed Johnson a period of reflection during which he had the opportunity to recognize the error of his initial decision to sell quaaludes. The jury also had before it Johnson's statement to Hills after the second sale, which he did not deny, to the effect that he (Johnson) could get Hills a better price if he bought five hundred ludes. Furthermore, the variances between Hills' and Johnson's testimony, as they related to the specifics of these encounters, were properly left to the jury. Consequently, under the state of the evidence in this case, a jury question arose as to whether Johnson willingly acceded to Hills' request to procure quaaludes or whether Hills induced the sale with undue pressure.

We have previously held that different counts of a single indictment are not interdependent. *State* v. *McNamara* (Aug. 23, 1978), Wayne App. No. 1539,

unreported. In *McNamara* the court concluded that because the offenses had occurred on separate occasions, the jury could consider each count individually, unaffected by a verdict on another count. Therefore, no argument can be made that Johnson's acquittal on Count I precludes his conviction on Count II which was a subsequent and separate sale.

Because we have found that the record in this case presented a jury question, the trial court committed no error by denying defendant's motions for acquittal during the trial. We also conclude that the verdict rendered is not against the manifest weight of the evidence and this court will not reverse it. See *State* v. *Eley* (1978), 56 Ohio St. 2d 169 [10 O.O.3d 340].

### Assignment of Error No. 3

"3. Error prejudicial to the right of the defendant to a fair trial was committed for failure of the trial court to declare a mistrial upon improper remarks of the prosecutor."

Defendant contends that the following statement, made by the prosecutor during closing arguments, prejudiced his right to a fair trial and warranted a mistrial order:

"There is a rule that runs around the law that is called the One Bite Rule. You own a dog and it bites somebody, that is okay, but now you all know that the dog may have vicious tendencies, and the next time it bites somebody you are going to be held responsible. Counsel is suggesting a one-bite rule for a drug dealer. The first time he deals drugs, it's okay. You don't have a predisposition to deal drugs, and that leaves the next time. — Do we want a one-bite rule for drug trafficking?

"And if you believe that, then convict him of the second count, because the first time he did deal drugs, and there is his first bite. * * *."

Although this statement may not be a proper statement of the law, it can also be construed as a comment upon the evidence within the range permissible for

closing argument. Furthermore, even if considered improper, the challenged statement is not so flagrant as to prevent a fair trial. *State* v. *Carver* (1972), 30 Ohio St. 2d 280, 291 [59 O.O.2d 343]. A ruling on a motion for a mistrial is within the court's discretion. Considering the statement objected to by defendant, we find no abuse of discretion in the trial court's refusal to declare a mistrial.

### Summary

We overrule all of appellant's assignments of error and affirm his conviction on the second count of the indictment.

*Judgment affirmed.*

BELL and QUILLIN, JJ., concur.