DECISION AND JUDGMENT ENTRY
{¶ 1} This case is before the court on appeal from the Wood County Court of Common Pleas, which entered a judgment following a jury verdict finding appellant Glenn Scurles guilty of two counts of trafficking in crack cocaine. Appellant contends that, because a police informant entrapped him, the judgment finding him guilty is against the manifest weight of the evidence. Because we find that the judgment was supported by the manifest weight of the evidence, we affirm the judgment of the trial court.
 {¶ 2} In 2002, appellant was indicted for two counts of trafficking in cocaine. These allegations stem from two controlled sales occurring on July 23 and August 14, 2002. In each sale, appellant sold crack cocaine to a confidential informant ("CI"), who was working with law enforcement officers assigned to a Drug Enforcement Administration ("DEA") task force. At trial, appellant admitted that he sold the cocaine but argued that the CI entrapped him into doing so. The jury nevertheless found appellant guilty on both counts, and the trial court sentenced him to a seven-year prison term on Count 1 and an eight-year term on Count 2, to be served concurrently with the first sentence. The trial court further ordered that appellant pay a fine of $5,000 on each count, that his operator's license be suspended for five years, and that he be subject to post-release control upon release from prison. Appellant now appeals, setting forth the following assignment of error:
 {¶ 3} "The trial court committed prejudicial error against defendant/appellant inasmuch as the jury verdict it entered was against the manifest weight of the evidence since his affirmative defense of entrapment entitled him to acquittal rather than conviction on the felony charges."
 {¶ 4} Since appellant alleged that he was entrapped by the CI, the most relevant trial testimony was the testimony of appellant and the CI. Not surprisingly, the testimony differs in some important respects. Nevertheless, it is undisputed that shortly before the two controlled buys, appellant had been released from prison after serving six and one-half months of a 17-month sentence for possession of cocaine. He was released on July 10, 2002, just shy of two weeks before the first controlled buy. It is also undisputed that while he was in prison, he made numerous collect calls to the CI, who arranged three-way conversations so that appellant could speak with whomever he wanted. Appellant promised to re-pay the CI for the phone calls upon appellant's release from prison.
 {¶ 5} The CI testified first. He had done numerous other controlled buys for law enforcement officers because he had been charged with trafficking in cocaine and was trying to earn favorable treatment. The CI indicated that he first met appellant at a woman's house in Fostoria where the CI was visiting and where appellant was staying. The CI stated that he assumed that appellant dealt in drugs because women would go upstairs in the house to see appellant and would come back down with drugs. Over objection, he also testified that he had heard that appellant dealt in drugs. However, he admitted that he never actually saw appellant sell drugs. Subsequent to these initial encounters, appellant went to prison for the cocaine possession charge, where he made the collect calls to the CI.
 {¶ 6} The CI testified that appellant called him upon appellant's release from prison. According to the CI, appellant asked the CI if he "was interested in getting hooked up with drugs." The CI responded that he knew someone who was interested in buying drugs and suggested to appellant that he (the CI) could buy them and resell them to this person. The CI told appellant that he would contact this person and get back to appellant. The CI then called the police and inquired about doing a controlled buy from appellant. The officers indicated that they wanted to set up such a buy.
 {¶ 7} According to the CI, when appellant called back some days later, they discussed a sale of crack cocaine. Appellant set the price at $850 for one-half ounce of crack cocaine. The CI testified that he told appellant that this price was high, and appellant responded that after they had made a few deals with each other, he could probably get the price down to $600 for one-half ounce. They eventually agreed on a meeting time and place. The CI suggested meeting in Bowling Green, Ohio, and appellant suggested meeting at a BP station in Bowling Green off of Interstate 75.
 {¶ 8} After following standard police procedures for preparing a CI for a controlled buy, the CI went to the BP in Bowling Green at the agreed-upon time and purchased the crack cocaine from appellant. The DEA task force agents videotaped the transaction from a remote vehicle, and the transaction inside the CI's vehicle was audiotaped. The tapes were played for the jury. The CI testified about portions of the conversation heard on the tape. The cocaine was weighed in the car and determined to be 16 grams, which was close to the agreed-upon amount of 14 grams.[1] The two also discussed the price again, and appellant again stated that he might be able to get the price down to $600 next time. The CI then testified that appellant was heard on the tape to say that "[h]e [appellant] wasn't screwing around with anybody else, he was going to stick with me [the CI]. We was going to make some money." The CI then told appellant that he would see what his buyer thought of the cocaine and would let appellant know. According to the CI, appellant appeared nervous during the buy, but in the CI's experience, drug dealers often are nervous.
 {¶ 9} The CI testified that shortly after the first controlled buy, he contacted appellant and told him that the buyer was satisfied with the cocaine and that he, the CI, would be interested in making another purchase — this time larger. According to the CI, appellant responded that "he could hook me up, he could get me more." They discussed the price. However, they did not agree on a meeting time because the DEA agents were not available to do the controlled buy. The buy eventually took place in August, but in the meantime, according to the CI, appellant called him several times about doing the second buy. Finally, when the agents were available, the CI and appellant agreed to meet in Perrysburg, Ohio, on August 14, 2002, in the Burger King parking lot. This time, the agreement was for the CI to purchase two ounces of crack cocaine for $3,000. The CI testified that appellant set both the price and the amount.
 {¶ 10} Again, after following standard police procedures, the CI proceeded to the agreed-upon place. Again, the transaction inside the car was audiotaped. This time, however, the transaction outside the car was not videotaped. The audiotape was once again played for the jury, and the CI testified as to the contents of the tape. The CI indicated that appellant was even more nervous on the second buy. However, once inside the CI's car, appellant showed the CI two bags of what looked to be crack cocaine. The CI stated that he would get his scale and money from the trunk of the car, which was, in actuality, a code to the agents to come in and arrest appellant. Appellant was, in fact, arrested, and the cocaine was recovered.
 {¶ 11} Upon questioning, the CI testified that he never threatened appellant into selling cocaine and made no promises to appellant except to pay him for the cocaine. Likewise, he testified that he never threatened appellant's family in order to induce appellant to sell him cocaine.
 {¶ 12} Appellant also testified as to the events surrounding the two controlled buys. First, appellant confirmed that he met the CI through a female friend who wanted to borrow money from the CI so that she and appellant could "party." Appellant admitted that "partying" included getting high and that he had, in the past, used marijuana and cocaine. As the CI stated, appellant called the CI collect from prison so that the CI could set up three-way phone calls enabling appellant to speak with whomever he wished while he was in prison. Appellant indicated that he promised to pay the CI back for the collect calls but denied that he ever promised to pay him back with drugs. Although a price for the calls was never discussed, appellant estimated that he made between 15 and 20 phone calls, each lasting 15 minutes, the maximum time allowed in prison.
 {¶ 13} Appellant testified that, upon his release from prison, he tried unsuccessfully to find work. He also testified that his probation officer, who was involved in his arrest on the possession case, did little to help him. In fact, appellant believed that his probation officer had ill feelings toward him. In addition to looking for work upon his release, appellant called the CI five days after his release to arrange to pay back the money for the collect calls. Appellant's account differs significantly here from the CI's account: According to appellant, it was the CI who initiated the discussion about drugs, not the other way around. Appellant testified that the CI asked him if he "was doing anything or knew anyone who was doing anything," explaining to the jury that he took this to be an inquiry about "drugs and purchasing cocaine." Appellant told the CI he would get back to him. Appellant admitted that he called the CI "an hour or two later" and stated, "Yeah, probably can do something." The two discussed a purchase of around one-half ounce. The CI indicated that this was the amount he was interested in, and appellant set the price of $850. However, appellant testified that he had no intention when he called the CI to sell drugs; he was merely calling to arrange pay-back for the phone calls.
 {¶ 14} Appellant testified about the audiotape of the first buy. He stated that he thought portions of the tape were "scratched out," like the part where the CI stated that if his friend liked the cocaine he might be interested in more (as the CI testified occurred) and the part where appellant stated that if the CI got more, appellant could probably get the price down (also as the CI testified occurred).
 {¶ 15} Appellant explained about using drugs to pay back the CI for the phone calls. Appellant stated that, before the first buy, the CI asked him if he could be re-paid for the phone calls with drugs. This is why, according to appellant, he is heard on the tape explaining that he gave the CI a little extra cocaine — about $100's worth.
 {¶ 16} Appellant testified that, after the first buy, the CI called him and told him that his friend liked the cocaine and he would be interested in buying more, but the CI was not sure when this would be. The CI stated that he would get back to appellant. Appellant admitted he initiated a call to the CI a couple of days later. He testified, "So by this time he already got me wheeled in. So like a day or two later, I called him. I said, `Well, what's going on with you and your friend over there?'" Appellant stated that the next time he spoke with the CI, it was the CI who called him and stated that he was ready to make the purchase. Appellant initially set a price of $3,250 for two ounces of cocaine. After some haggling, the two agreed on a price of $3,000. Appellant then testified as to meeting the CI at the Burger King in Perrysburg, Ohio, and getting arrested.
 {¶ 17} Appellant discussed his motivation for selling drugs to the CI. He stated that he was "surviving off of [his] wife" (who had saved $1500 from a tax refund) while he was looking for employment and trying to keep up with the conditions of his probation. He also indicated that he had his wife had their eyes on a house and did not have anywhere to live, so he thought the drug money would be "a nice jump start to get this little money." However, he contended that it was never his idea to sell drugs and he would not have even thought of it had the CI not mentioned it to him. He testified: "And before I even left the penitentiary I already had made up my mind that I wasn't going to mess with it no more, no way. And it's pretty hard and pretty tempting when you come like in a struggling situation." Finally, he testified that these were the only two times he had ever sold drugs.
 {¶ 18} On cross-examination appellant stated that it was not difficult to obtain the cocaine he sold because it was "on every street corner" in his neighborhood. He stated that for the first buy he calculated the price to charge the CI by gauging how much he was paying for it from his source. When asked if he knew how much to charge for the second buy, appellant stated, "Yes. After I thought about it for a while after the first buy." Finally, appellant testified that the CI did not threaten him or make any promises to induce him to sell the cocaine.
 {¶ 19} A couple of the agents involved in this case provided testimony relevant to the entrapment defense. First, Deputy Sheriff Michael Ackley, a DEA narcotics agent, testified that the price for the cocaine in the first buy — $850 for 16 grams — was "not too bad; a little bit high. Probably a couple hundred dollars too much." However, he also indicated that he has often seen purchases for similar amounts that have been much higher. As for the price for the cocaine in the second buy — $3,000 for two ounces — Agent Ackley testified that the price was too high for a second buy and it raised concerns among the officers that, if the CI gave appellant the money, they would be robbed. When asked if the price for the second buy was "outrageous," Agent Ackley testified that it was high, but not outrageous. On cross-examination, he testified that a high price is common for a first buy between two individuals. Similarly, Agent Kip Lewton testified that $3,000 for two ounces was "rather high"; he later stated that it was "very high." Agent Lewton, like Agent Ackley, was afraid, given the price, that the CI would be robbed if he handed over the money. However, he, like Ackley, has seen the price higher for similar amounts of cocaine.
 {¶ 20} As for appellant's experience as a drug dealer, Agent Ackley testified that, before he heard about appellant from the CI, he had not known of appellant and did not know him to be a drug dealer. However, based on information from the CI, a source proven to be reliable in the past, and based on appellant's conduct during the two buys, Agent Ackley expressed his opinion that appellant was an experienced drug dealer. Specifically, Agent Ackley pointed to the fact that appellant professed to know the
 {¶ 21} quality of the drugs he was selling, that appellant knew that the price would go down on a second buy, and that appellant re-paid the CI for the phone calls with a couple of grams of cocaine.
 {¶ 22} Following the testimony, appellant sought and received an entrapment instruction but was nonetheless found guilty of two counts of trafficking in cocaine. He now appeals. Appellant contends that the verdict is against the manifest weight of the evidence. "Weight of the evidence" refers to the jury's resolution of conflicting testimony. State v. Thompkins (1997),78 Ohio St.3d 380, 387. In determining whether a verdict is against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and "* * * weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id. at 387.
 {¶ 23} In 1983, the Supreme Court of Ohio adopted a subjective test for defining the entrapment defense. In setting out its definition, the Court stated:
 {¶ 24} "The defense of entrapment is established where the criminal design originates with the officials of the government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order to prosecute." State v. Doran (1983),5 Ohio St.3d 187, paragraph one of the syllabus.
 {¶ 25} However, the defense is not established where "government officials `merely afford opportunities or facilities for the commission of the offense' and it is shown that the accused was predisposed to commit the offense." Id. at 192, citing Sherman v. United States (1958), 356 U.S. 369, 372. The Court then set out a non-exhaustive list of factors that a court may use to determine if an accused was predisposed to commit the crime. These factors include:
 {¶ 26} "(1) the accused's previous involvement in criminal activity of the nature charged, (2) the accused's ready acquiescence to the inducements offered by the police, (3) the accused's expert knowledge in the area of the criminal activity charged, (4) the accused's ready access to contraband, and (5) the accused's willingness to involve himself in criminal activity." Doran, 5 Ohio St.3d at 192.
 {¶ 27} The defense of entrapment is an affirmative defense that must be proven by a preponderance of the evidence. Id. at 193.
 {¶ 28} As for the first factor, the accused's prior criminal involvement, the record contained evidence that appellant was at least a user of drugs and had served a prison term for possession. Whether he was previously a drug dealer was a matter of some dispute. Although appellant testified that these two buys were the only two times he had sold drugs, the CI's testimony and Agent Ackley's testimony provided circumstantial evidence that appellant had dealt in drugs before.
 {¶ 29} The second factor relates to the accused's acquiescence to police inducements. Here, at least for the first buy, it is disputed whether the CI provided any inducements at all. Although appellant disagrees, the CI testified that appellant initiated the conversation about buying and selling drugs. However, even if the jury believed appellant that the CI suggested selling drugs, appellant admitted that he only thought about the proposition for an hour or two before agreeing to do it. With regard to the second buy, appellant and the CI agree that the CI suggested another buy. However, appellant admitted that after the CI suggested the second buy and then did not get back to appellant about it, appellant called the CI to inquire when they would make the sale.
 {¶ 30} The third factor relates to the accused's knowledge of the criminal activity in which he engaged. Appellant argues in his brief that his high charge for the cocaine was evidence that he was not knowledgeable about the drug trade. However, appellant testified that, for the first buy, he set the price by gauging how much he was paying for the cocaine, and for the second buy, he gave the price some deliberate thought. This testimony tends to show that appellant was not just guessing about the price. Also, there was testimony that appellant was familiar with the jargon and the customs in the drug trade and that he knew that a gram or two of cocaine would be about a $100 payback to the CI for the phone calls. Finally, Agents Ackley and Lewton testified that, though the price for the cocaine was high for both buys, it was not out of the realm of what they have seen in the past.
 {¶ 31} The fourth factor is the accused's access to the contraband This factor has little meaning in this case as appellant and the agents involved all agreed that cocaine was readily available where appellant lived.
 {¶ 32} Finally, the fifth factor relates to appellant's willingness to engage in criminal activity. As noted above, appellant, by his own testimony, only thought about the first buy for an hour or two before agreeing to it. Appellant also admitted that, after the CI suggested the second buy, appellant followed up with the CI to see when that buy could take place. There was no testimony that the CI had to repeatedly ask appellant to sell drugs; he readily did so when asked once.
 {¶ 33} Courts have found the entrapment defense proven by a preponderance of the evidence where the government or its agent cultivates a relationship with the accused over a period of time and then asks the accused several times to commit the offense before the accused agrees to commit a crime he or she has no history of ever having committed. See, e.g., State v. Fryant
(Dec. 30, 1998), Fayette App. No. CA88-06-008; State v. Trevey
(Apr. 30, 1984), Clinton App. No. CA83-05-005. In both cases, the court noted the agent's repeated requests and how the friendship, and not monetary gain, was the inducement. In a similar case, the court found that the defense was proven where the government's agent cultivated a friendship with the accused and then asked the defendant if he knew where he (the agent) could get some marijuana. The defendant responded
 {¶ 34} "everyone is asking me that tonight" as he had just refused a third person's offer to sell him marijuana. Nevertheless, feeling "beholden" to the agent because of their friendship, he agreed to introduce the agent to the third person who previously offered to sell marijuana to the accused. The accused was not present for the sale and made no money on the deal. There was no evidence of any prior criminal activity or drug usage. See State v. Forrest (June 13, 1988), Fayette App. No. CA87-12-015, jurisdictional motion overruled (1998),40 Ohio St.3d 706.
 {¶ 35} All of these cases are distinguishable from the instant case: Here the CI never "courted" appellant; the CI only had to ask appellant once to sell drugs (if appellant's testimony is to be believed). Also, there was evidence that, if believed, showed appellant to be an experienced drug dealer.
 {¶ 36} On the other hand, this court has held that the defense was not proven by a preponderance of the evidence even where the informant approached the accused and asked for drugs several times. See State v. Martinez (Dec. 23, 1994), Ottawa App. No. 94OT010. In so holding, we noted additional evidence in the record that the accused had a history of drug usage and dealing and had initiated conversations about drug dealing several times with the informant. Id. See, also, State v.Ellison, 2003-Ohio-6748, 6th Dist. No. L-02-1292, at ¶ 22, appeal not accepted for review (Apr. 14, 2004), 2004-Ohio-0169;State v. McGlothin (Apr. 9, 1993), Erie App. No. E-92-23 (analogous cases from this court holding that the entrapment defense was not proven by a preponderance of the evidence).
 {¶ 37} Taking all of the testimony together, we cannot say that the jury "lost its way" when it found appellant guilty of trafficking in cocaine. See Thompkins, 78 Ohio St.3d at 387. There was ample testimony that, if believed, prevented appellant from establishing by a preponderance of the evidence that he was an innocent person not predisposed to commit the crime with which he was charged. See Doran, 5 Ohio St.3d at 192.
 {¶ 38} Upon due consideration, we find that appellant was not prejudiced or prevented from having a fair trial, and the judgment of the Wood County Court of Common Pleas is affirmed. Appellant is ordered to pay the court costs of this appeal.
Judgment affirmed.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Knepper, J., Pietrykowski, J., Singer, J. Concur.
[1] The CI testified on cross-examination that he and appellant discussed during this first buy that the extra two ounces would take care of appellant's debt to the CI for the phone calls.