DECISION AND JUDGMENT ENTRY
{¶ 1} This cause comes on appeal from the Ottawa County Court of Common Pleas. A jury found appellant, Jeremy Hill, guilty of three counts of trafficking in cocaine, violations of R.C. 2925.03(A) and felonies of the fifth degree, and one count of trafficking in crack cocaine, a violation of R.C. 2925.03(A) and a felony of the third degree. The indictment specified that the first three counts of trafficking in cocaine occurred in the vicinity of a juvenile; the jury found appellant not guilty as to this specification. Appellant was sentenced to 11 months in prison as to each count of trafficking in cocaine, and a mandatory term of 12 months for the third degree felony of trafficking in cocaine. R.C. 2929.13(F), 2929.14(D)(3). The sentences were ordered to run concurrently, for a total term of 12 months incarceration. Appellant was also ordered to pay all costs of prosecution and "any fees permitted pursuant to Ohio Revised Code Section 2929.18(A)(4) * * *."
 {¶ 2} Appellant now raises two assignments of error:
 {¶ 3} "I. Appellant's convictions are against the manifest weight and sufficiency of the evidence when the appellant's unlawful conduct was the product of an informant using sexual favors to induce him to convey drugs for sex."
 {¶ 4} "II. The trial court errord [sic] by not instructing the jury on entrapment when the government's informant used sexual favors to induce appellant to convey drugs for sex."
 {¶ 5} In his first assignment of error, appellant asserts that there was insufficient evidence to support his conviction and that the verdict was against the manifest weight of the evidence. Applying the "sufficiency of the evidence" standard, a reviewing court determines whether the evidence submitted is legally sufficient to support all elements of the offense charged. State v. Thompkins (1997),78 Ohio St.3d 380, 386-387. Specifically, we must determine whether, "after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks
(1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 6} If legally sufficient evidence supports a conviction, a court may still find a conviction was against the manifest weight of the evidence. "Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. State v. Thompkins, supra, at 387. A conviction is against the manifest weight of the evidence when a greater amount of credible evidence supports acquittal. State v. Thompkins, supra at 387. Challenges to the weight of the evidence attack the credibility of the evidence presented. Id. To overturn a verdict as against the manifest weight, the jury must have "clearly lost its way and created such a miscarriage of justice" that the verdict must be reversed. State v. Martin (1983),20 Ohio App.3d 172, 175. A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." Id. When an appellate court reviews a verdict and sentence under the manifest weight standard, it reviews the entire record. Thompkins, supra, at 387.
 {¶ 7} In his brief, appellant argues only that if the trial court had instructed the jury on entrapment for Count 4, he would have been acquitted on all counts. In each of the first three transactions, the basis of the three fifth degree felony counts, appellant sold cocaine to a confidential informant ("CI"), who was working with law enforcement officers assigned to a drug enforcement task force. In the fourth transaction, the basis of the third degree felony, appellant sold a larger amount of cocaine directly to an undercover officer; the CI was not present during this transaction. Since this argument relates more to appellant's second assignment of error regarding jury instructions, we will jointly consider appellant's assignments of error.
 {¶ 8} In his second assignment of error, appellant argues that the trial court erred in refusing to give his requested jury instructions on entrapment as to the fourth count of trafficking in cocaine. We review a trial court's decision to grant or refuse requested jury instructions for an abuse of discretion. State v. Wolons (1989), 44 Ohio St.3d 64, 68. An abuse of discretion occurs when the court's decision is unreasonable, arbitrary, or unconscionable, and amounts to more than an error of law or judgment. Id.
 {¶ 9} Since appellant's arguments all relate to the affirmative defense of entrapment, we will briefly review facts from appellant's testimony, the CI's testimony, and the task force investigator's testimony. The task force officer primarily involved in this investigation, Carl Rider, testified first. Prior to each sale, he and another female officer would follow the same procedure with the CI: fitting her with a wire to transmit and record the conversations; giving her "buy money," the serial numbers of which were recorded; and searching her for drugs. The CI had asked Rider for additional money to give appellant for a prior debt she owed to appellant. Rider agreed to give her a small amount of cash before each transaction to repay this debt, in order to maintain the relationship between the CI and appellant. While the CI purchased drugs from appellant, Rider listened on the transmitter. After the CI completed each sale, she would meet Rider at a pre-arranged location and deliver the drugs she had purchased. The female officer would search the CI again to ascertain that she had not kept any drugs from the sale.
 {¶ 10} Appellee played the recordings of each of the three transactions between appellant and the CI. Appellant did not object at trial to playing only those portions of the tapes with conversation. On August 2, the CI contacted Rider, who then, together with a female officer, met with the CI. After following the standard procedures preparing the CI for the controlled buy, the CI, wearing the transmitter and recording device, entered appellant's apartment building, went directly to appellant's apartment, and immediately gave him $30 toward her debt, and asked to buy $40 worth of drugs. Appellant went to a back room in his apartment and returned a few moments later with what was later determined to be cocaine wrapped in tissue paper. Appellant took the CI's marked money, gave her the cocaine, and the CI returned directly to meet Rider. Rider testified to substantially the same facts as to the two subsequent transactions involving the CI, occurring August 9 and August 11; except that on August 11, the CI asked to buy $50 worth of cocaine instead of $40. Rider also testified that he did not perceive the CI to be under the influence of narcotics during the transactions, and searches of the CI before and after each transaction revealed no narcotics.
 {¶ 11} On cross-examination, Rider acknowledged that, before working with the CI, he had her review and sign a document titled "Confidential Questionnaire" and other documents. Relevantly, the questionnaire asked: "Do you understand that you are not privileged to break any laws during the course of providing any services to this agency?" The CI signed in the affirmative. Rider also had the CI sign a form which detailed the definition of entrapment; relevant to appellant's defense was the document's statement: "You cannot give or infer sexual favors to entice a person to commit a criminal offense." Rider also acknowledged that appellant's transactions were the first that the CI performed for the task force, and that it was the CI who initiated the first transaction with appellant. Upon questioning, Rider acknowledged that, although a female police officer would never trade sexual favors for drugs with a suspect in the course of an investigation, in his opinion, it would not "be equally wrong" for a female CI to "sleep with" a suspect for drugs. Rider did testify that, in his initial interview with the CI, he had asked her whether she had purchased drugs from appellant in the past. Rider opined that, since the CI knew that appellant was selling drugs, having the CI provide another opportunity for appellant to sell drugs was not entrapment. When asked, Rider testified that there was no way for the transmitter or recorder to be turned off, so there was no chance that appellant and the CI engaged in sex acts during the three to seven minute transactions.
 {¶ 12} The CI testified to substantially the same facts and circumstances regarding each of the three sales. She acknowledged that she was "working off" a potential charge by making controlled buys of drugs. She also acknowledged that she and appellant were involved in a sexual relationship and admitted that she exchanged sexual favors for drugs from appellant before becoming a CI. She denied, however, exchanging sex for drugs in each of the three controlled buys for the task force and denied making any promises to do so. She also denied that the task force told her or directed her to exchange sex for drugs, and denied having sex with appellant for money. Upon cross-examination, when asked whether she considered that the task force did not want her exchanging sexual favors for drugs, she answered, "While I was wearing a wire, yes."
 {¶ 13} After the CI, Rider continued his testimony. After the third transaction, the CI offered to continue working with Rider and the task force as a CI. Rider provided the CI with a cell phone and a pager in order to maintain contact. The CI contacted Rider on August 22, and said that she had arranged another buy. Rider waited for the CI at their pre-arranged meeting place, but the CI never arrived. Rider paged the CI, and received a phone call back from a male who identified himself as Jeremy. According to Rider's paraphrase of Jeremy's telephone statements, Jeremy said, "You better take care or the bitch is dead." Rider told the male that he had a wrong number and hung up. Rider again paged the CI and received another call from the same male voice. This time, the male advised Rider to check his voice mail. Rider listened to the voice mail message, which threatened Rider that he "better take care of [the CI's] debt or he would tell my wife I was having an affair." Subsequently, three similar messages were left by the same male voice; Rider recorded them; one message referenced the pager that Rider had given the CI.
 {¶ 14} Convinced at this point that appellant was the male leaving messages, Rider returned the calls, this time posing as a "friend" of the CI who was using the cocaine purchased from appellant. After several phone calls back and forth, Rider, posing as "Chris," contacted the male voice, who again identified himself as Jeremy. Jeremy (appellant) told "Chris" that the CI owed him $250 for a debt and that appellant would tell his ("Chris'") wife if the debt was not paid. "Chris" assured appellant that he would pay for the CI's debt, and told appellant not to hurt her. "Chris" told appellant that the CI was "ripping him off" when she bought cocaine for him, and that he would prefer to deal with appellant directly. Appellant agreed. "Chris" asked appellant about buying an "eight ball" — an eighth of an ounce of crack cocaine — and appellant quoted him a price of $300. They agreed to speak again in a few days.
 {¶ 15} Because Rider would not be working when he planned to meet with appellant, another agent, Carl Johnson, posed as "Chris" for the transactions. Another detective, St. Clair, headed the operation for this, the fourth, controlled buy with appellant. Rider explained the background of the case to St. Clair, gave St. Clair the cell phone which appellant would call "Chris." Johnson testified that Rider explained the background of the case to date, explained the necessity of paying off the CI's debt to have the task force pager and cell phone returned. While St. Clair taped the phone call, Johnson — posing as "Chris" — called appellant and left a message. Appellant returned the call to "Chris" and, according to St. Clair's testimony, was upset that the CI's debt had not yet been paid. "Chris" and appellant agreed to meet.
 {¶ 16} On August 28, Johnson, posing as "Chris," met with appellant outside appellant's apartment building; Johnson was wired with a recorder and transmitter; St. Clair listened on the transmitter. A tape of that meeting was played at trial. A male voice, identified by St. Clair as appellant, asked Johnson if he had seen any cops around the area. They also discussed the CI's debt, and Johnson paid appellant $250 to satisfy that debt. No drug transactions occurred, but they discussed appellant selling "Chris" an eighth of an ounce of crack cocaine. Appellant agreed, but said that he "didn't have it at that point." The following day, Johnson, still posing as "Chris," talked with appellant on the cell phone. Although this phone call was not recorded, Johnson testified that appellant told Johnson that he could "get a better deal" if he bought two "eight balls" for $300, as opposed to one eight ball for $200. Johnson agreed, and the two arranged to meet that night.
 {¶ 17} St. Clair and another officer met Johnson before the transaction, and after following standard procedure for marking the transaction money and fitting Johnson with the transmitter and recording device, "Chris" (Johnson) met with appellant in the parking lot of appellant's apartment building. Appellant entered the passenger side of Johnson's car, and asked Johnson if he was "wearing a wire." Johnson asked appellant for the CI's pager. Appellant then left the vehicle, walked out of Johnson's sight, came back "a minute or two" later, gave Johnson the pager taken from the CI, took two bags of crack cocaine out of his pocket and set them on his knee, and said, "there it is." When Johnson picked it up and "pretended [he] was checking it out," appellant said, "don't worry, it is good." Laboratory testing confirmed that the bags together contained 5.26 grams of crack cocaine.
 {¶ 18} St. Clair and Johnson both testified that they had no knowledge of the CI's sexual involvement with appellant.
 {¶ 19} Appellant testified that he first met the CI soon after moving into his apartment building, and approximately a week after they met, they began a sexual relationship. He testified that the CI first raised the "drug issue," by asking him if he "hustled." Appellant told her no; later, during that same conversation, the CI told appellant that if he could get her some crack cocaine, that they "could have a relationship." Approximately a week later, appellant testified that he did get the CI some crack cocaine, and they began a sexual relationship in exchange. He admitted that he obtained the crack cocaine from a known drug dealer in Fremont. He also admitted that he obtained crack cocaine for the CI and had sex with her in exchange about 15 times, but stated they had "sexual relations" in addition and unconnected to, the drug transactions. Although appellant first asserted that he stopped their relationship in the beginning of August, before the CI purchased cocaine for the task force, he then stated that he and the CI were still involved after the August 29 transaction with "Chris." He denied ever paying the CI money for sex, but admitted that he and the CI had sex every time he obtained cocaine for her. He also admitted "loaning" the CI money, which she would then pay back, "sometimes double" or "other times just 20 [dollars] more." He also denied ever having kept a supply of drugs; rather, when the CI wanted him to get cocaine, he would have to go to Fremont to get them. When asked about the controlled buys from the CI of August 2, August 9, and August 11, appellant said that the CI "pinched them," meaning she would "grab it and unwrap it and break a piece off and stick it inside of her bra and rewrap it."
 {¶ 20} Appellant also testified that, with respect to his transaction with "Chris," he assumed that Chris was the CI's lover, and that he contacted Chris "for her [the CI]." According to appellant, the CI gave him her pager so that he could contact "Chris" and that it was the CI's idea; however, he admitted selling "Chris" the "quarter ounce" of crack cocaine. Appellant reiterated his admissions on cross-examination, but maintained that he only made the transactions based on his sexual interest for the CI. Upon further cross-examination, appellant stated that "every time" he gave drugs to the CI, it was in exchange for sex, including the transactions of August 2, August 9, and August 11. Immediately thereafter, he also admitted that, on the controlled buy dates, he had the cocaine inside his apartment, readily accessible, and did not have to leave to get the cocaine; but he denied selling cocaine to anyone other than the CI. He also admitted to taking the CI's cell phone and pager, "out of anger," because she had not paid off the debt as she had promised.
 {¶ 21} After appellant's testimony, Rider again testified and asserted that it would have been impossible for the CI to have told appellant about "Chris," since she was never told about the existence of an undercover officer; all the CI was told was that her debt would be paid.
 {¶ 22} Appellant requested that the jury be given entrapment instructions as to all four counts; the state argued that since appellant had admitted to trafficking in cocaine during his testimony, no instructions should be given. Appellant argued that instructions were warranted because the CI was involved in an ongoing course of conduct — exchanging sex for cocaine — even though some of the transactions preceded her involvement with the task force. The trial court chose to instruct the jury on the entrapment defense only as to the first three counts involving the CI, and not as to the fourth count, since the CI was not involved.
 {¶ 23} The trial court instructed the jury on entrapment by stating:
 {¶ 24} "As to the affirmative defense, the Defendant is asserting an affirmative defense known as entrapment. The Defendant denies that he intended, or formed a purpose, to commit an offense. He claims that he is excused because he was entrapped by the police.
 {¶ 25} "The burden of going forward with the evidence of entrapment and the burden of proving an affirmative defense is on the Defendant. He must establish such a defense by a preponderance of the evidence.
 {¶ 26} "Preponderance of the evidence is the greater weight of the evidence, that is, evidence that you believe because it outweighs or overbalances in your minds the evidence opposed to it.
 {¶ 27} "A preponderance means evidence that is more probable, more persuasive, or of greater probative value. It is the quality of the evidence that must be weighed. Quality may or may not be identical with quantity, or the greater number of witnesses.
 {¶ 28} "In determining whether or not an affirmative defense has been proved by a preponderance of the evidence, you should consider all the evidence bearing upon that affirmative defense regardless of who produced it.
 {¶ 29} "If the evidence or if the weight of the evidence is equally balanced or if you are unable to determine which side of an affirmative defense has the preponderance, then the Defendant has not established such an affirmative defense.
 {¶ 30} "If the Defendant fails to establish the defense of entrapment, the State still must prove to you beyond a reasonable doubt all the elements of the crime charged.
 {¶ 31} "Entrapment occurs when a police officer plants in the mind of the Defendant the original idea or purpose, thus furnishing from the start the incentive or moving force to commit the offense that the Defendant had not considered and which he would not have carried out except for that inventive or moving force.
 {¶ 32} "If the Defendant did not himself conceive of committing the offense, and if it was suggested to him by the officer for the purpose of causing his arrest and prosecution, the Defendant must be found not guilty.
 {¶ 33} "Briefly, the whole criminal idea and purpose originates with the police, not with the Defendant.
 {¶ 34} "In these cases, the informant, * * *, is to be considered the same as a police officer for purposes of determining entrapment.
 {¶ 35} "The affirmative defense of entrapment shall be considered by you in your determination of Counts 1, 2, and 3 only. The defense of entrapment does not apply to Count 4 and shall not be considered by you in your determination of Count 4."
 {¶ 36} The Supreme Court of Ohio has adopted a subjective test for the entrapment defense, which is defined as and established "where the criminal design originates with the officials of the government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order to prosecute." Statev. Doran (1983), 5 Ohio St.3d 187, paragraph one of the syllabus. Entrapment is an affirmative defense pursuant to R.C. 2901.05(C)(2). Id., paragraph two of the syllabus. The defense is not established where "government officials `merely afford opportunities or facilities for the commission of the offense' and it is shown that the accused was predisposed to commit the offense." Id. at 192, citing Sherman v. UnitedState (1958), 356 U.S. 369.
 {¶ 37} Failure to allocate any burden of proof on the affirmative defense of entrapment when giving jury instructions is prejudicial error and requires reversal. Id. at paragraph three of the syllabus. However, as quoted above, the trial court properly allocated the burden of proof on entrapment.
 {¶ 38} "Entrapment is a `confession and avoidance' defense in which the defendant admits committing the acts charged, but claims that the criminal design arose with the state's agent * * *. The primary consideration in any determination of entrapment is the defendant's predisposition to commit the crime." State v. Edwards, 6th Dist. No. L-00-1161, 2003-Ohio-571, ¶ 35, citing State v. Johnson (1982),4 Ohio App.3d 308, 310; see also, Doran, supra, stating that the accused's predisposition is the "key consideration" with the subjective test. In State v. Scurles, 6th Dist. No. WD-03-041, 2004-Ohio-2214, ¶ 26, we applied the non-exhaustive list of factors from Doran to determine whether an accused was predisposed to commit the crime. Those include "(1) the accused's previous involvement in criminal activity of the nature charged; (2) the accused's ready acquiescence to the inducements offered by the police; (3) the accused's expert knowledge in the area of the criminal activity charged; (4) the accused's ready access to contraband; and (5) the accused's willingness to involve himself in criminal activity."
 {¶ 39} The surveillance tapes and the testimony at trial — including appellant's admissions during his testimony — was sufficient evidence to allow a rational trier of fact to find all elements of trafficking in cocaine beyond a reasonable doubt. Further, appellant's testimony and the evidence admitted at trial formed a manifest weight of the evidence supporting all the elements of trafficking in cocaine for each count.
 {¶ 40} Applying the list of Doran factors, we find: (1) although there was no evidence that appellant was involved in cocaine trafficking before meeting the CI, appellant admitted to transacting in cocaine with the CI (albeit for sex) before the indictable offenses occurred; (2) appellant readily acquiesced when the CI asked to purchase cocaine for money on each of the controlled buys; (3) appellant knew where to find cocaine and knew how much to charge the undercover officer and the CI for it, including bargaining with the officer to sell more cocaine in order to get a better deal; (4) appellant had ready access to cocaine; it was at hand in his apartment when approached by the CI and it took only a few days to obtain a larger amount for the fourth transaction; (5) appellant was not offered inducements beyond money, or emotional or coercive persuasions — aside from, as appellant asserts, the persuasion of access to the CI's sexual favors libidinally appealing to him.
 {¶ 41} As for the trial court's limitation of the entrapment instructions to the first three counts of trafficking in cocaine — those involving the CI — we cannot say an abuse of discretion occurred. Appellant's entire argument rests on his assertions that the CI entrapped him into selling drugs due to their pre-existing sexual relationship where sex was traded for drugs. In an entrapment defense, a confidential informant is considered an agent of the government. Although Rider testified that it would be wrong for a female undercover officer to exchange sex for drugs from a suspect, but that it was not wrong for a confidential informant to do so, this opinion is factually irrelevant to this matter and we refrain from commenting on the manifold ethical implications of his view. We only note that this CI was not a confidential informant when she began exchanging sex for drugs with appellant. Therefore, the CI was not an agent of the government for entrapment purposes when she exchanged sexual acts for cocaine, and her conduct in exchanging sex for drugs need not be considered. Since appellant's arguments regarding entrapment focus on the CI's conduct, the trial court did not abuse its discretion by limiting its entrapment instructions to the transactions involving the CI.
 {¶ 42} The evidence in the record before us demonstrates that the CI gave appellant money to buy cocaine during the "controlled buys" upon which these indictments were based. There is no evidence of sexual acts occurring during the controlled buys; indeed, the tapes are devoid of verbal reference to sexual acts during the controlled buys. Although appellant testified that the CI did, at some point, exchange sex for those transactions, the CI testified otherwise. The fact-finders were free to weigh and evaluate the credibility of this conflicting testimony. In determining whether the judgment of the trial court is against the manifest weight of the evidence, it is not the role of the reviewing court to judge the credibility of witnesses. State v. DeHass (1967),10 Ohio St.2d 230, 231.
 {¶ 43} As for jury's failure to find, by a preponderance of the evidence, that appellant established the affirmative defense of entrapment, we find that substantial justice was done. We cannot say, when acting as a "thirteenth juror," that a miscarriage of justice occurred. "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Thompkins (1997), 78 Ohio St.3d 380, 387. The jury could have reasonably found that the self-contradictions and self-refutations in appellant's testimony detracted from his credibility. Appellant admitted to each transaction of cocaine. Moreover, although appellant asserted that the CI later engaged in sexual activity with him for the cocaine in the controlled buys, the tapes of the controlled buys contained no such evidence and the jury, contemplating the CI's testimony, resolved the credibility issues to find otherwise. Upon review, we cannot say that the jury "lost its way" when it rejected appellant's entrapment defense. Given these facts, we do not perceive any logical connection between an omission of entrapment instructions as to the sale without the CI's involvement, and prejudice to appellant when entrapment instructions were given as to the sales of cocaine to the CI. Appellant's argument that, but for the lack of entrapment instructions as to Count 4, the jury would have found entrapment established as to the first three counts, is logically unsupportable.
 {¶ 44} For the foregoing reasons, appellant's assignments of error are not well-taken. Judgment of the Ottawa County Court of Common Pleas is affirmed and appellant is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Ottawa County.
Judgment affirmed.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Handwork, J. Singer, P.J. Skow, J., concur.